UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
ISHAK FRIED AND BROOKLYN CLOSEOUT CO.,          :
                                                :
                      Plaintiffs,               :
                                                :          06 Civ. 1528 (HB)
           - against -                          :
                                                :          <u>OPINION & ORDER</u>
RONALD KELLY, KELLY COMPANY WORLD               :
GROUP, INC. , and all subsidiaries, affiliates, and :
related companies,                              :
                                                :
                      Defendants.               :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

  On February 24, 2006, Ishak Fried, ("Fried") and Brooklyn Closeout Company ("BCC") (collectively "Plaintiffs"), filed a complaint against Ronald Kelly ("Kelly"), Kelly Company World Group, Inc. ("KWG"), and all subsidiaries, affiliates, and related companies (collectively "Defendants") that alleged breach of contract and securities fraud, and sought monetary damages for breach of contract in the amount of $1.5 million, no less than $10 million for securities fraud, and a declaration that Plaintiff Fried is a fifty percent shareholder in every company in which Defendant Kelly has an interest. A bench trial was held on April 11, 2007 and post-trial findings of fact and law were received from the parties on April 19, 2007.[1] The Court heard summations on April 27, 2007.

## I. FINDINGS OF FACT

  In the late 1980s, both Fried and Kelly were actively engaged in the closeout business.[2] Fried Decl. ¶ 4; Kelly Decl. ¶ 4. At that time, the cellular phone business was in its early stages. Kelly Decl. ¶ 5. Mr. Fried was the principal of BCC, which specialized in the wholesale purchase and sale of electronic merchandise. Fried Decl. ¶ 4. In 1988, Mr. Kelly and his wife incorporated Kelly Company International (later renamed "KWG") to engage in the purchase and sale of wholesale commercial goods such as clothing and electronics from Taiwan. Kelly Decl. ¶ 4.

---

[1] Defendants moved this Court on April 11, and again on April 13, 2007 for directed judgment pursuant to Fed. R. Civ. P. 52(c). I reserved decision on Defendants' motion at the close of trial (Tr. 99:17-22) and now deny the post-trial motion.

[2] Kelly testified that a "closeout" is a deeply discounted inventory, often directly from a manufacturer, which is sold without manufacturers' warranties and service. Tr. 131:4-7.

A.     *The Sale/Purchase of Philips' PCA Phones*

In 1989, KWG began to deal in cellular phones manufactured by Eriksson, Motorola, Nokia, and Philips North America. Kelly Decl. ¶ 5. Around that time, Philips North America requested that Kelly attempt to locate buyers for telephones that had been manufactured for a company that went bankrupt. Between 1989 and 1990, Kelly purchased phones from Philips at a discounted price and resold more than a thousand phones to retailers (who, in turn, sold them to customers) for a substantial profit. By 1990 or 1991, Philips decided to exit the cellular phone business, wanted to dispose of its remaining inventory—including some unassembled parts—, and asked Kelly to assist them in finding a buyer for the inventory. Tr. 113:9-13.

Fried and Kelly were introduced to one another by a mutual contact in the closeout business sometime in 1990.[3] Fried expressed an interest in buying the discounted phones, and Kelly invited Fried to Philip's warehouse in Florida to see the inventory. Kelly Decl. ¶¶ 7, 8; Fried Decl. ¶ 5. Shortly after their meeting in Florida, Fried agreed to purchase Philips' entire inventory, or 5,000 model P832T cellular phones, from Kelly at a discounted price of $200 per phone. DX-C, Kelly Decl. ¶ 8. Thereafter, Kelly notified Fried that there were only 4,700 assembled phones, but component parts were also available. The parties renegotiated a total purchase price of $1,150,000 for the available phones and component parts. Fried took out a letter of credit for $1,150,000 from Merchant Bank (DX-D), but ultimately, paid Kelly with a wire transfer for the purchase of the PCA phones. Kelly Decl. ¶ 12.

Kelly sold Fried the PCA phone inventory for a profit of $250,000. The sale of PCS phones was an arms-length transaction between the parties,[4] as explained in Kelly's deposition:

> Q.     After that purchase was consummated, what, if anything, did you or Mr. Fried do with respect to the marketing of those telephones?
>
> A.     Well, at that point we had consummated our responsibility. We had completed our share of responsibility. We had facilitated the sale of the product and the product was moved to Mr. Fried; as far as we were concerned, the deal was over.
>
> Q.     What was your fiduciary responsibility?

---

[3] The parties dispute the details of their first face-to-face meeting—Mr. Fried insists the parties' first meeting occurred in his Brooklyn office, and Mr. Kelly insists the parties first met in Florida when he showed Mr. Fried the Philips inventory. Tr. 117:12-118:20. The location of their first meeting is irrelevant to this decision.

[4] Fried and Kelly often acted through their companies—Fried, through BCC and Kelly through KWG and other companies incorporated by Kelly through the years.

>   A.  To make sure the transaction took place, the phones got delivered to Mr. Fried and they did.

Kelly Deposition (Oct. 19, 2006) Tr. 30:2-13.

Despite Fried's assertions to the contrary,[5] the record reflects that the phones were transferred directly from the PCA warehouse in Florida, to Mr. Fried's warehouse in Brooklyn. See Tr. 40:18-44:13; DX-S (indicating that the customer name and location is Brooklyn Closeout, 167 Clymer Street, Brooklyn, New York); DX-B (indicating that "per instructions from the buyer" FOB/TAMPA, FLORDIA to 167 Clymer St., Brooklyn, and stating requirement of a "clean truckers bill of lading cosigned to Brooklyn Closeout Corp."); Tr. 123:21-22 ("All the phones were delivered to Brooklyn.").

### B.  Resale of PCA Phones

In 1991, a few months after the sale of the PCA phones, Kelly received a call from Fried requesting his assistance in the resale of those phones. Kelly Decl. ¶ 13. Although Fried had experience in the closeout business (Fried Decl. ¶ 4), he did not have experience in the cellular phone business, which was a different market than the closeouts he was accustomed to. Tr. 130:14-131:22. Fried and Kelly orally agreed that Kelly would contribute his experience in the cellular phone business to locate buyers for the PCA phones and provide customer support, Fried would provide his financial investment in the phones, and they would equally share profits from the sale of the PCA phones. Kelly Decl. ¶¶ 13, 14. The agreement was never reduced to writing. Id. ¶ 14. For approximately one year, Kelly (or his companies) sold PCA phones on behalf of Fried. While the sales generated revenues, they never made a profit, in part because the cellular technology on the market quickly outpaced the technology of the PCA phones. Id. ¶ 15.

### C.  Production and Sale of Omni A Phones

In April of 1991, upon the advice of Kelly, Fried agreed to have the component parts assembled in a fashion that allowed their use in an updated telephone. Kelly Decl. ¶ 17. Once again, the parties agreed to equally share the profits from this venture; Fried supplied the financial resources and Kelly, his efforts and experience. However, the telephones turned out to be unreliable because of their construction, more than half of the phones failed shortly after they were sold, a number of them were returned, and the business venture failed. Despite the setbacks and the fact that the venture did not generate profits, Kelly sent Fried approximately twenty

---

[5] See Tr. 36:22-44:13.

checks for a total of $463,580 which, according to Kelly, represents the revenue generated by phone sales.  Id ¶¶ 18, 19; DX-H.

### D. *Production and Sale of Omni B Phones*

Fried and Kelly agreed to a business venture to design, manufacture and sell an entirely new cell phone called the Omni B phone, in part, an attempt to recoup some losses on the two prior phone ventures.  Once again, Fried supplied the financial capital[6] and Kelly his experience, and the two agreed to share equally in the profits of this venture. Kelly Decl. ¶ 22.   In 1992, Kelly formed Omni Cellular Ltd. to design and sell cellular phones using his experience and contacts.  Kelly Decl. ¶ 21.  The development and sale of Omni B phones would be one of the first projects of Omni Cellular; however, Omni Cellular was not created solely for the sale of Omni phones with Fried, it also engaged in the business of prepaid cellular telephones and phone design outside of the Omni B.  Kelly Decl. ¶¶ 21, 27.

In 1993, sales of the Omni B phone began to generate revenues and Kelly began to assist Fried to pay down his debt with Merchant Bank—e.g., he sent four wire transfers directly to Merchant's Bank between July and October 1993 for a total of $190,000.  Kelly Decl. ¶ 23; DX-J.  Between January 1994 and May 1996, Kelly sent a total of $290,000 directly to BCC from the sale of the Omni B phones.  DX-K;[7] Tr. 163:25-168:2.  As he did in the Omni A venture, Kelly sent Fried money above and beyond the money Kelly sent to the Bank even though the undertaking never generated profits.[8]  Kelly Decl. ¶ 24; Tr. 163:1-13.  This business venture ultimately failed because of a serious manufacturing defect.  In late 1993 or early 1994, Fried refused to provide any additional funding, and told Kelly that he was left with an outstanding debt of approximately $1.5 million to Merchant's Bank.  Id. ¶¶ 25, 26.  According to Kelly, Fried never produced any documentation to substantiate his alleged $1.5 million outstanding debt, and

---

[6] The record does not reflect the amount of money Fried invested in this venture, however, according to Kelly, Fried incurred an additional debt with Merchant's Bank to finance the cost of manufacturing the phones. Kelly Decl. ¶ 22.

[7] January 21, 1994 ($20,000.00); August 12, 1994 ($50,000.00); October 5, 1994 ($25,000.00); December 22, 1994 ($15,000.00); January 4, 1995 ($15,000.00); March 7, 1995 ($15,000.00); April 10, 1995 ($15,000.00); May 4, 1995 ($15,000.00); July 20, 1995 ($15,000.00); August 30, 1995 ($15,000.00); October 3, 1995 ($15,000.00); November 3, 1995 ($30,000.00); December 7, 1995 ($15,000.00); January 10, 1996 ($15,000.00); May 15, 1996 ($15,000.00).

[8] Kelly testified during trial that he developed a fondness for Mr. Fried during their business ventures and his desire to help Mr. Fried financially recoup some of his losses from the business failures was motivated by this affection, especially in light of the death of Mr. Kelly's father at that time.  See, e.g., Kelly Decl. ¶¶ 26, 39.

no documents were submitted during trial. Id. at ¶ 26.

### E.     *Sale of the Omni Business and the January 1995 Document*

After the failure of the Omni B phone venture, despite Omni Cellular Ltd.'s success in other areas of its business, Kelly searched for potential buyers or investors. Kelly Decl. ¶ 27. Kelly sent Fried a letter on November 23, 1994 in which he notified Fried that he had entered into a letter of intent with a Chinese company that would infuse capital into the Omni business. DX-L. Kelly also told Fried "[t]hat this will allow me to start paying off the bank for you as early as December 15, 1994," and that he asked his lawyer to prepare "a document that must be signed concerning the million and a half dollars paid to release all [of Fried's] interest in Omni." Id.

On November 28, 1994, Mr. Biagini, Kelly's lawyer, faxed a draft document wherein Fried would release all claims "arising out of the business relationships" in exchange "for and in consideration of the payment by Ronald R. Kelly to Ishak Fried or Brooklyn Closeout Corporation of $1,500,000 on or before January 30, 1995." DX-M. Although the deal with the Chinese investor fell through and the final document was never signed by either side, Kelly told Fried he still wanted to help him if he could find another buyer. Kelly Decl. ¶ 32.

In early January 1995, Fried and Kelly attended an annual consumer electronics show in Las Vegas. The document—the alleged "contract" at issue, entitled "[r]elease" and dated January 8, 1995—is somewhat similar in substance to but different from the document referenced in Kelly's November 23, 1994 Letter to Fried and provides for a release of:

> any and all claims . . . owed to him by Ronald R. Kelly arising out of his relationships with Ronald R. Kelly or businesses controlled or operated by Ronald R. Kelly in return for the following:
> 1. Receipt by Ishak Fried of $1,500,000 from Ronald R. Kelly, on or before November 1, 1995, payments on said amount anticipated to commence on or about May 15, 1995.
> 2. Receipt by Ishak Fried of monthly payments in the amount of $15,000.00 during the period prior to the commencement of the payments provided for herein.

PX-1. Fried claims that Kelly's attorney prepared this document and presented it to him at the electronics show (Fried Decl. ¶¶ 10, 11), while Kelly claims Fried (or his attorney) prepared and presented the document to him at the same show (Kelly Decl. ¶ 33). Although both Fried and Kelly signed the document, Kelly indicated next to his name that he "reviewed" it. Kelly made the notation on advice of counsel when he called his lawyer, Mr. Biagini, from the electronics

5

show and he informed Kelly that he had not prepared or seen the document. Kelly Decl. ¶ 35. Kelly specifically indicated that he did not agree to the terms:

> Q. In any event, when you signed this document [PX-1], did you understand that this obligated for you to pay one million five hundred thousand dollars to Mr. Fried?
>
> A. I did not sign that document and agree to that transaction or payment schedule. I reviewed it but I did not agree to it per my counsel's advice.

Kelly Dep. Tr. 66:2-10.

Further, Fried acknowledged that the debt to Merchant's Bank was his alone:

> Q. You had a debt—at one point you had a debt to the Merchant's Bank, correct?
>
> A. What – yes?
>
> Q. And that debt was your responsibility, or the responsibility of Brooklyn Closeout, correct?
>
> A. Yes.
>
> . . .
>
> Q. When Merchant's Bank came looking for payment, they came to you, right?
>
> A. Yes.
>
> Q. Not Mr. Kelly?
>
> A. No.

Tr. 70:10-71:4. See also DX-O (explaining to the IRS that his company suffered a loss of approximately $1.4 million in fiscal year 1993 because he was unable to find customers for his cellular phone products, and "[o]nly Freetex Industries, Inc. [Fried's company] was responsible for losses.").

Between 1995 and 1996, Kelly sent Fried a series of checks for product revenues from the joint venture in the sale of Omni B phone inventory for a total of $463,000. Tr. at 149:12-19; 150:3-7; 151:23-152:11. Ultimately, Mr. Kelly signed a letter of intent with a different investor, the Mara Fund, for the sale of the Omni business for $10 million; however, he only received $1 million in the end, which he used to pay his company's outstanding debts. Tr. at 146:22-147:14. According to Kelly, neither he nor Fried made any profit from the sale of the Omni business.[9] Kelly Decl. ¶ 38. As of May 1996, Kelly stopped sending revenue payments from the sale of the Omni phones to Fried because the revenue stream had stopped with the sale and transfer of the

---

[9] This is not discussed on the record by the Plaintiff.

Omni business.  Id.

### F. *IMI Telecommunications, Inc. Stock Certificate*

On January 24, 2000, Kelly mailed Fried a stock certificate for 250,000 shares of IMI Telecommunications, Inc. ("IMI")[10] common stock.  PX-16, PX-17.  Kelly sent these shares to Fried from his personal shares of common stock (Trial Tr. at 105:21-24) in the hopes that his attempts to take IMI public would materialize, add value to the stock, and "would cover [Fried's] losses."  Tr. at 106:13-21; 174:8-22.  However, Kelly did not give the shares to Fried as a security or as consideration for a debt owed to Fried.  Tr. 175:3-176:4.  The company was (and is currently) a private company, although Kelly continues to work towards taking it public. Tr. 156:22-157:1.

## II. CONCLUSIONS OF LAW

### A. *Declaratory Judgment (Count I)*

Fried alleges that he is a "fifty percent shareholder in every company in which Kelly has an interest."  Compl. ¶ 18.  There was never any written partnership or joint venture agreement between Fried and Kelly (Kelly Decl. ¶ 14), and therefore, at best, I can treat theirs as an oral partnership or joint venture agreement.[11]  The plaintiffs' central contention presumes but failed to explore the existence of a partnership and the extent, consequences of, and length of the partnership/joint venture (Fried Decl. ¶ 6; Kelly ¶ 14).

For instance, while the Plaintiff presumes the existence of a partnership, the record is devoid of evidence that Fried shared in the management of the cellular phone ventures with Kelly, and therefore, Fried failed to meet his burden with respect to this essential element of proof.  New York law assigns the burden of proof that a partnership existed to the party pleading its existence.  *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03-CV-0613

---

[10] IMI Telecommunications was previously known as Future Com Global and is currently known as 21st Century Technologies.  Tr. 155:17-22.

[11] I need not determine whether Fried and Kelly's business relationship is a "partnership" or a "joint venture" for purposes of the decision at bar because the elements of proof are essentially the same. Scholastic, Inc. v. Harris, 259 F.3d 73, 84 (2d Cir. 2001) ("Under New York law joint ventures are governed by the same legal rules as partnerships because a joint venture is essentially a partnership for a limited purpose." (citations omitted).  However, the Court recognizes the distinction between joint ventures and partnerships. See, e.g., Hoskin v. New Grovetown Associates, 129 Misc. 2d 222, 225 (N.Y. Misc. 1985) ("It has been said that a joint venture is a limited partnership -- not limited in a statutory sense as to liability, but as to scope and duration and thus one distinction between [the] two forms of association is that a joint venture relates to a single transaction (though it may be considered a business to be continued over several years), while a partnership relates to a general business of a particular kind.") (citation omitted).

(GBD), 2004 U.S. Dist. LEXIS 780 (S.D.N.Y. Jan. 22, 2004).  "To demonstrate the existence of a partnership, Fried must prove four elements: (1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners."  *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 171-172 (S.D.N.Y. 2004) (citations omitted).  The absence of a single element is fatal to the establishment of a partnership or joint venture.  Id. at 171.  Both Kelly and Fried testified that Fried had no control over the management of the business and that his contribution was limited to financial support.  See, e.g., Tr. at 177:4-12; Fried Decl. ¶6.  Indeed, during trial, Fried repeatedly touted his inexperience in the cellular phone business as a reason why Kelly solely managed the sale of the phones.  See, e.g., Tr. 72:19-25.  The existence of a partnership requires that the parties exert joint control over management and decision-making (see *DIRECTV Group, Inc. v. Darlene Invs., LLC*, No. 05-CV-5819 (WHP), 2006 U.S. Dist. LEXIS 69129, *15-16 (S.D.N.Y. Sept. 27, 2006)) and therefore, because his claim for declaratory judgment turns on the existence of a partnership between the two, it fails as a matter of law.  *See Orderline Wholesale Distributors, Inc. v. Gibbons, Green, Van Amerongen, Ltd.*, 675 F. Supp. 122, 127 (S.D.N.Y. 1987) (finding that the requirement that the parties have some degree of control over the management of the venture was not met, and, therefore, the plaintiff was a "passive investor, not a partner").

Alternatively, Fried's claim for declaratory relief is barred by the six-year stature of limitations applicable to a determination of the rights of shareholders under New York law.  *See, e.g., Stern v. BSL Dev. Corp.*, 163 A.D.2d 35, 35 (1st Dep't 1990) (holding statute of limitations applicable to request for declaration that plaintiff was a shareholder of defendant corporation is six years under CPLR 213(1)).  As Kelly correctly points out, because all of the relevant events occurred prior to February 24, 2000, Fried's claim for declaratory judgment is time-barred.  Fried Decl. ¶¶ 12-13, 15-16; PX-16, 17; Brach Decl. ¶¶ 1-3.

### B.     *Breach of Contract (Count II)*

Fried's next claim alleges that "Defendant Kelly owes plaintiff Fried the sum of $1.5 million, together with interest from January 8, 1995."  Compl. ¶ 21.  This claim is based on an alleged contractual obligation set forth in a document dated January 8, 1995 (PX-1), pursuant to which Fried allegedly released all claims against Kelly in exchange for $1.5 million.  I turn to

New York substantive law to determine the existence of a contract and any alleged breach. *Cantor Fitzgerald v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) (citations omitted). To recover on a breach of contract claim, New York law requires that the party alleging the existence of the contract proffer evidence to show (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). Further, the party alleging the existence of the contract bears the burden of proving that "there was a meeting of the minds, demonstrating the parties' mutual assent and mutual intent to be bound." *N.F.L. Ins. Ltd. v. B&B Holdings, Inc.*, 874 F. Supp. 606, 611 (S.D.N.Y. 1995).

I find that no enforceable contract existed between Fried and Kelly primarily because there was no mutual assent to be bound to the January 1995 document. While there is some disagreement as to the drafter and origin of the 1995 document—e.g., Tr. at 78:20-81:10; Tr. at141:12-142:21), it is irrelevant in this instance. Mr. Kelly's undisputed testimony provides that his signature on the January 1995 document (PX-1) modifies the word "reviewed" in the document. His testimony supports the proposition that he never agreed to the terms of the document. Kelly Decl. ¶¶ 35, 36; Tr. 141:12-142:21. Therefore, because there was no meeting of the minds, Kelly did not breach the terms of the alleged 1995 contract because there was no 1995 contract.[12]

---

[12] Defendants argue that this claim is barred by New York's six year statute of limitations for breach of contract claims which begins to run from the date of the alleged breach, which would be, at the latest, January 1996. See NY CPLR 213(2). Further, they assert that even if Plaintiffs were to rely on the transfer of 250,000 shares of IMI as "partial payment,"(See Carlo Lizza & Sons Paving, Inc. v. Int'l Fid. Ins. Co., No. 05-CV-5047 (DRH)(WDW), 2006 U.S. Dist. LEXIS 71095, *14 (E.D.N.Y. Sept. 29, 2006) (explaining that "[p]artial payment of a debt serves to toll the statute of limitations on that debt, on the theory that partial payment is tantamount to a voluntary acknowledgment of the existence of the debt")), the statute of limitations still bars this claim because the transfer occurred on or about January 24, 2000 (Fried Decl. ¶ 15; PX-17), exactly six years and one month later. Fried, in turn, contends that Defendants should be estopped from raising the statute of limitations defense because Kelly's delivery of the certificate of 250,000 shares of IMI was intended to placate him and induce him not to sue. See Fried Decl. ¶13 ("[T]hrough 2005. . . [Kelly] continuously assured me that he was taking his company or companies public and that as soon as that happened, he would pay me what he owed me with interest, and that he could not pay me until that occurred."); ¶14 ("By late 1999. . . Kelly said that he did not have the funds to pay, but he would have the funds to pay as soon as the public offering of the shares of stock of his companies was completed.); ¶16 ("These assurances continued until approximately January of 2006, at which time Kelly told me that he owed me nothing."). Pursuant to New York law, equitable tolling is properly invoked where there has been an "affirmative wrongdoing" by the defendant where "the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." Plaintiff

C.      *Violation of the Securities Act of 1933 (Count III)*

Count III alleges that "defendants have both orally and in writing offered shares of stock in the defendant companies without disclosing plaintiffs' interest to the extent of fifty percent of the shares of each and all such companies."  Compl. ¶ 21.  This claim is predicated on Fried's ownership interest in Kelly's companies, and because Fried did not have a fifty percent interest in Kelly's companies, Kelly had no duty to disclose such interest.

Further, Count III alleges that the foregoing conduct constituted a "securities fraud" pursuant to the Securities Act of 1933, 15 U.S.C. § 77(a).  See Compl. ¶ 22.  In 1952, the Second Circuit set forth the modern standing requirement with respect to private actions under the Securities Act of 1933:[13] only actual purchasers or sellers of securities may recover damages. *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 464 (2d Cir.), *cert. denied,* 343 U.S. 956 (1952).  Although *Birnbaum* has since been criticized and narrowed by courts (*see, e.g., Goodall v. Columbia Ventures*, 374 F. Supp. 1324, 1329 n. 18, 19 (S.D.N.Y. 1974) (citing cases)), it is still pertinent and good law with respect to a plaintiff (here Fried) who seeks to recover damages pursuant to the Securities Act.  *Id*.  Fried, by his own admission, is neither a seller nor purchaser of the securities at issue here.  Fried Decl. ¶15 (acknowledging that Kelly gave him the 250,000 shares of IMI Telecommunications Inc.).  Although Fried argues that Kelly gave the 250,000 shares to him as "security" for money owed to him pursuant to the January 1995 document (Fried Decl. ¶15), the record does not support that allegation since the 1995 document was not a legally enforceable contract.  Fried has not alleged any other consideration such that he would be a "purchaser" under the Securities Act.  Therefore, I find that Fried has not met his burden with

---

must establish "reasonable reliance on deception, fraud or misrepresentations by the defendant."  Putter v. North Shore Univ. Hosp., 7 N.Y.3d 548, 552-53 (2006); T&N PLC v. Fred S. James & Co. of New York, Inc., 29 F.3d 57, 62 (2d Cir. 1994) (same).  Fried has failed to meet his burden.  The allegedly fraudulent statements do not establish an affirmative attempt on the part of Kelly to mislead or defraud Fried.  To the contrary, Kelly believed he had no obligation to Fried yet sent him revenues from any sale of the Omni phones, not just the agreed upon profits as a means to assist Fried with his financial burdens.  Tr. 151:16-152:11.  Fried himself acknowledged that he alone was "on the hook" with Merchant's Bank for the money. Tr. at 70:22-71:5.  Further, it is undisputed that Kelly attempted to take one of his companies, IMI Telecommunications, Inc., public over the years (Kelly Decl. ¶ 41) and Fried, himself, acknowledges that Kelly kept him apprised of his efforts over the years.  Fried Decl. ¶15, PX-18-22 (shareholder materials).  The fact that Kelly to date has been unable to take his company public, while perhaps unfortunate for Fried as a company shareholder, does not rise to the level of fraud and misrepresentation required to invoke equitable estoppel under New York law.  Therefore, Fried's breach of contract is barred by the six-year statute of limitations.

[13] Fried never alleges a substantive violation of the Securities Act but rather a general allegation pursuant to 17 (e).  Unfortunately for Mr. Fried, there is no Section 17(e) of the Act.

respect to his claim for relief under the Securities Act of 1933.

### D.     *Sanctions*

Defendants urge this Court to impose sanctions upon Plaintiffs and their counsel pursuant to Fed. R. Civ. P. 11 and the Private Securities Litigation Reform Act ("PSLRA") of 1995 for filing and pursuing a frivolous claim under the Securities Act of 1933.  While the Court recognizes Congress' intent to "reduce the economic incentives for bringing [frivolous securities] actions" (*Gurary v. Nu-Tech Bio-Med, Inc.*, 303 F.3d 212, 219-220 (2d Cir. 2002) (citations omitted), counsel's pursuit of a securities action, while less than diligent and ultimately determined to be without merit, does not rise to the level of frivolousness or bad faith to warrant the imposition of sanctions pursuant to Rule 11.  Plaintiffs allege a securities violation pursuant to Section 17(e) of the Securities Act.  Although subsection (e) does not exist, during trial, counsel argued in support of section 17 violations generally.  See, e.g., Tr. (Apr. 27, 2007) at 13:15:14:19 (arguing that Defendants violated the Securities Act of 1933 by "selling" unregistered shares to Fried).  Therefore, I deny Defendants' request that I impose sanctions.

### III.     CONCLUSION

For the reasons above, there was no legally binding contract between Fried and Kelly, and Fried is not entitled to a declaratory judgment or monetary damages.  Further, because there was no "purchase" or "sale" of securities pursuant to the Securities Act, I find there is no fraud.  The complaint is dismissed in its entirety with prejudice and the Clerk of the Court is instructed to close this matter and remove it from my docket.

**IT IS SO ORDERED.**

New York, New York
June 26, 2007

_____
U.S.D.J.